**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| OURARING, INC.,<br><br>     *Plaintiff*,<br><br>v.<br><br>ULTRAHUMAN HEALTHCARE LLC and<br>SVTRONICS, INC.,<br><br>     *Defendants*. | Civil Action No. 2:25-cv-928<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Ouraring, Inc. ("Oura"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 for Patent Infringement against Defendants Ultrahuman Healthcare LLC, ("Ultrahuman"), and SVTronics, Inc. ("SVTronics") (together, "Defendants") and further alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

## OVERVIEW

1.   This is an action for patent infringement by Oura. Originally founded in Finland in 2013, Oura is a pioneer in developing smart ring technology that allows users to take control of their health. Oura set out to develop a product that accurately provides personalized insight into a user's fitness and health by monitoring heart rate, temperature variations, blood oxygen levels, and movement during both sleep and active periods. Unlike other wearables (*e.g.*, wrist wearables) that are typically bulky and can be intrusive or interfere with a person's daily life (*e.g.*, uncomfortable to wear during sleep or for extended periods of time), Oura developed its product in an innovative, attractive, and user-friendly form—a ring.

2.      Since its founding, Oura has released four generations of Oura Ring: Generation ("Gen.") 1 (2015), Gen. 2 (2018), Gen. 3 (2021), and Gen. 4 (2024).



3.      Backed by over a decade of experience and research, Oura's primer Oura Ring has received numerous awards for its innovation, including the 2020 TIME Magazine's Best Invention, 2022 Best Sleep Tracker by Men's Heath Magazine, 2023 CNBC's Disruptor 50 List, 2023 Health Fitness Award, Cosmopolitan Best Overall Fitness Ring for 2024, Women's Health Magazine Sleep Tracker 2024, New York Times Best Sleep Tracker 2025, WIRED Best Ring Fitness Tracker 2023, Forbes Best Sleep Tracker 2024, among other recognition. Oura Ring was also selected by the National Basketball Association (NBA), the Ultimate Fighting Championship (UFC), and other organizations to equip their athletes with the most accurate and credible health technology found in Oura Ring.

4.      Based on Oura's business relationship with the U.S. Department of Defense ("DoD") and the U.S. military, Oura is expanding its manufacturing operations into Texas. Specifically, Oura is opening a factory, expected to be fully operational in 2026, in Fort Worth, Texas to meet the needs of its DoD contracts. *See* https://ouraring.com/blog/oura-us-department-of-defense/.

5.      Oura's success has attracted copycats and knockoffs seeking to benefit from the market that Oura built through innovation and hard work. As Oura has grown, so too has its protection of its intellectual property. Oura has amassed a patent portfolio containing well over a

hundred patents worldwide related to the structure, design, and manufacturing of smart ring wearables and actively enforces its patents through licensing and/or litigation. Other smart ring manufacturers recognize the value of Oura's intellectual property and have obtained a license from Oura in the recent past, including another smart ring company known to consumers.

6.      Oura is forced to bring this action against Defendants as a result of Defendants' knowing and ongoing infringement of Oura's patents as further described herein.

7.      Following in Oura's footsteps, on information and belief, Ultrahuman launched its original Ultrahuman Ring product in July 2022, nearly seven years after Oura's original Gen 1. Since then, Ultrahuman has set out on a campaign to copy Oura's marketing materials, poach Oura's engineers, and sought to benefit from Oura's success at a lower start-up price through Ultrahuman's copying.

8.      The foregoing actions caused Oura to file its first suit against Ultrahuman on September 1, 2023, in this District, alleging copyright and patent infringement claims. *See Ōura Health Oy et al. v. Ultrahuman Healthcare Pvt. Ltd. et al.*, Case No. 2:23-cv-00396-JRG-RSP, Dkt. 1 (E.D. Tex. Sept. 1, 2023) (hereinafter, "*Ultrahuman I*").

9.      In retaliation, on January 4, 2024, Ultrahuman filed nuisance lawsuits in India against Oura and its principals (*e.g.*, CEO and COO), alleging defamation. *See* Exhibit 1. While the Indian suit is still pending, the basis of Ultrahuman's claim is that Oura defamed Ultrahuman simply by accusing Ultrahuman of infringing Oura's patents. As discussed further herein, such claim of patent infringement has since been proven to be true in the United States International Trade Commission ("ITC"). But rather than defend such claims in the still-pending *Ultrahuman I* action, Ultrahuman sued in India where Oura does not conduct business.

10.    On March 13, 2024, Oura was forced to file a Section 337 Complaint in the ITC against entities related to Ultrahuman concerning the Accused Products discussed herein. *See Certain Smart Wearable Devices, Systems, and Components Thereof*, Inv. No. 337-TA-1398. Ultimately, the Commission found a violation of Section 337 based on a finding that Ultrahuman's smart rings infringe claims 1, 2, and 12-14 of U.S. Patent No. 11,868,178 (the "'178 Patent") and issued remedial orders accordingly. *See Certain Smart Wearable Devices, Systems, and Components Thereof*, Inv. No. 337-TA-1398, Notice of the Comm'n Final Determination (Aug. 21, 2025).

11.    Throughout ITC Investigation No. 337-TA-1398, the Administrative Law Judge ("ALJ") and the Commission admonished Ultrahuman for its lack of credibility. The following are just examples of the statements made by the ALJ regarding Ultrahuman's conduct from an entire introductory section devoted to the lack of credibility of Ultrahuman's CEO, Mohit Kumar:

    a.    "A concerning issue regarding Ultrahuman's credibility, however, needs to be addressed up front." *Certain Smart Wearable Devices, Systems, and Components Thereof*, Inv. No. 337-TA-1398, ID at 28 (Apr. 18, 2025).

    b.    "Undeterred, however, Mr. Kumar, who unquestionably knew that any evidence regarding an Ultrahuman facility in Texas was false, repeatedly testified about it anyway." *Id.* at 25.

    c.    "The falsity of information was not limited to Mr. Kumar, as Oura pointed out.…Based on the information uncovered by the private investigator Oura hired during trial, these statements in Ultrahuman's pre-hearing brief and the underlying testimony of Mr. Kumar were false." *Id.* at 26.

d. "Here, there is no reason why Ultrahuman's counsel or its CEO, Mr. Kumar, should have thought that providing testimony based on an altered video was appropriate. Based on the entirety of the above-detailed conduct, I find that Mr. Kumar was not a credible witness.'" *Id.* at 29.

12.    Ultrahuman's lack of candor is not limited to United States courts. Even the High Court of Delhi at New Delhi found that Ultrahuman willfully suppressed relevant information in the course of litigation. Specifically, on August 22, 2025, Ultrahuman filed a patent infringement case against Oura in the Delhi High Court that was dismissed immediately by the court due to Ultrahuman's willful suppression of relevant facts. *See* https://www.entrepreneur.com/en-in/news-and-trends/ultrahuman-files-patent-infringement-case-against-oura-in/496230; https://blog.ultrahuman.com/blog/ultrahuman-files-patent-infringement-suit-against-oura/.    In disposing the patent infringement suit, the Court of Delhi admonished Ultrahuman's litigation conduct noting the following:

a. "Willful failure of [Ultrahuman] to disclose a material fact/document under the ruse of its personal opinion of the party cannot be accepted." Exhibit 2 at 5.

b. "[Ultrahuman] during the course of the arguments has not shown any contrition for not filing these documents and has exhibited a defiance which this Court is unable to appreciate." *Id.* at 6.

c. "This Court is of the opinion that the non-filing of [ITC] order dated 18.04.2025 and 21.08.2025 is willful and deliberate, meriting the dismissal of the suit." *Id.*

5

13.    Ultrahuman's willingness to alter evidence, misrepresent facts, and suppress relevant information also seems to not be limited to courts. In April 2024, during the pendency of the ITC Investigation, it is Oura's understanding based on information and belief that Ultrahuman edited Oura's Wikipedia in an apparent attempt to spread false information about Oura and mislead the public. Specifically, the Oura Wikipedia page was edited to "accuse Oura of being a patent troll," "inaccurately represent the manner in which the Oura Ring device must be warn," and "delete references to several of Oura's accolades and innovations." These were among some of the actions taken by Wikipedia editor accounts named "Mohitsami" and "Tomhhelsinki." *See* Exhibit 3. On information and belief, the "Mohitsami" editor is associated with Mohit, Ultrahuman's founder. After an investigation, Wikipedia found edits made to Oura's Wikipedia page "to be made with the intention of causing disruption" and reverted the website to a previous version before the cyberattacks. *See* Exhibit 4.

14.    Oura is willing to engage in licensing discussions with Defendants, but Defendants continue to infringe Oura's global patent rights, attempt to tarnish Oura's reputation, and refuse to license Oura's global patent portfolio. Thus, to protect its infringement rights, Oura has been forced to file a Section 337 Complaint in the United States International Trade Commission; defend multiple attacks on its patent portfolio, reputation, and products; and now files this complaint of patent infringement.

## **PARTIES**

15.    Plaintiff Ouraring, Inc. is a Delaware corporation with its principal place of business at 222 Kearny Street, San Francisco, California 94108.

16.    Ouraring, Inc. is a wholly owned subsidiary of Oura Health Oy, a Finnish company founded in 2013.

17.    On information and belief, Defendant Ultrahuman is a Delaware limited liability company. Ultrahuman may be served through its registered agent Harvard Business Services, Inc., 16192 Coastal Hwy, Lewes, Delaware 19958.

18.    On information and belief, SVTronics is a Texas corporation. SVTronics may be served through its registered agent Jasmat Sutaria, 3465 Technology Drive, Plano, Texas 75074.

19.    On information and belief, Defendants have formed a business partnership and conduct business operations in the Eastern District of Texas at facilities located at 3465 Technology Drive, Plano, Texas 75074 ("Plano Facility"). *See* https://mashable.com/article/ultrahuman-ring-us-factory-expansion.

20.    On information and belief, Defendants employ full-term personnel such as sales personnel and engineers in this District, including at the Plano Facility.

21.    Defendants offer their products and services, including the products accused of infringement in this Complaint, to customers and potential customers located in the Eastern District of Texas.

**NATURE OF THE ACTION, JURISDICTION, AND VENUE**

22.    Oura brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States.

24.    This Court has personal jurisdiction over Defendants in this action pursuant to due process and/or the Texas Long Arm Statute, by virtue of at least the substantial business each Defendant conducts in this forum, directly and/or through intermediaries, including but not limited to: (1) having committed acts within the Eastern District of Texas giving rise to this action and

having established minimum contacts with this forum such that the exercise of jurisdiction over each Defendant would not offend traditional notions of fair play and substantial justice; (2) having directed its activities to customers in the State of Texas and this District, solicited business in the State of Texas and this District, transacted business within the State of Texas and this District and attempted to derive financial benefit from residents of the State of Texas and this District, including benefits directly related to the instant patent infringement causes of action set forth herein; (3) having placed their products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Texas and in this District; and (4) either individually, as members of a common business enterprise, and/or in conjunction with third parties, having committed acts of infringement within Texas and in this District.

25.    For example, SVTronics maintains regular and established offices in the Eastern District of Texas, including at 3465 Technology Dr., Plano, TX 75074. Further, on information and belief, Ultrahuman directs and controls the actions of SVTronics, or acts in concert with SVTronics, such that it too maintains regular and established offices in the Eastern District of Texas, including at 3465 Technology Dr., Plano, TX 75074. Furthermore, the purposeful contacts by SVTronics are imputable to Ultrahuman.

26.    Upon information and belief, Defendants' Plano Facility serves as a hub for its Ring AIR product with divisions, including wearables, marketing, and product management being located in the Plano Facility in this District. Defendants have described their "plans to fulfill **all** U.S. orders out of its Texas-based facility." *See* https://mashable.com/article/ultrahuman-ring-us-factory-expansion (emphasis added). Specifically, "[t]he 'UltraFactory' is a partnership with U.S.-based SVTronics and has plans to expand annual manufacturing capacity to 500,000, meeting U.S. demand." *Id.* In Ultrahuman's founder and CEO's words, "[t]he UltraFactory in Plano, Texas,

allows us to deliver products faster, enhance quality control, and further strengthen our commitment to American consumers to bring them cutting-edge health technology." *Id.*

27.     Defendants, directly or through their distribution network, have purposefully and voluntarily placed infringing products in the stream of commerce knowing and expecting them to be purchased and used by consumers in the United States, including in the Eastern District of Texas.

28.     On information and belief, Defendants have also derived substantial revenues from infringing acts in the Eastern District of Texas, including from the sale and use of infringing products (including the Accused Products, to be defined below).

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400.

30.     Venue is proper as to Ultrahuman under 28 U.S.C. § 1391(b)(2) because Ultrahuman performs a substantial part of its infringing acts in this District by making, using, selling, offering to sell, and importing infringing products in this District. Thus, Ultrahuman has committed, and continues to commit, acts of patent infringement within the District.

31.     Venue is proper against SVTronics in this District pursuant to 28 U.S.C. § 1400(b) because SVTronics resides in and has a regular and established places of business in this District, including a facility at 3465 Technology Dr., Plano, TX 75074. *See In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018), *In re Cray Inc.*, 871 F.3d 1355, 1362–63 (Fed. Cir. 2017).

32.     Defendants are properly joined under 35 U.S.C. § 299(a)(1) because Defendants, through their own acts and/or through the acts of other entities acting as their agent, representative, or alter ego, commonly and/or jointly design, manufacture, and/or sell accused products such that at least one right to relief is asserted against Defendants jointly, severally, and in the alternative with respect to the same transactions, occurrences, or series of transactions or occurrences relating

to the making, using, selling, making, and/or offering to sell in, and/or importing into the United States the same accused products.

33.    Defendants are properly joined under 35 U.S.C. § 299(a)(2) because Defendants, through their own acts and/or through the acts of other entities acting as their agent, representative, or alter ego, make, use, sell, and/or offer to sell in, and/or import into the United States the same or similar accused products, such that questions of fact will arise that are common to all Defendants.

34.    Upon information and belief, Ultrahuman and SVTronics, acting in concert, have placed the accused products in the stream of commerce, knowing the likely destination of the products in the United States and this District. Upon information and belief, Ultrahuman has further purposefully availed itself of the United States and this District by directing SVTronics to take action in the United States and this District, including, upon information and belief, manufacturing the accused products in this District.

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 12,393,228

35.    Oura incorporates paragraphs 1-34 above by reference.

36.    U.S. Patent No. 12,393,228 (the "'228 Patent," attached hereto at Exhibit 5) duly issued on August 19, 2025, and is entitled *Wearable Computing Device*.

37.    Oura is the owner by assignment of the '228 Patent and possesses all rights under the '228 Patent, including the exclusive right to recover for past and future infringement.

38.    The '228 Patent is directed to a finger-worn wearable ring device. In particular, the apparatus disclosed in the '228 Patent ensures the inclusion of a curved battery, printed circuit board, temperature sensor, first light emitting diode (LED), second LED, and an accelerometer, gyroscope, or both, between an internal and external housing of a wearable ring device. Further,

the apparatus disclosed in the '228 Patent provides "a wearable computing device [that] can be worn for extended periods of time and can take many measurements and perform various functions because of its form factor and position on the finger of a user." '228 Patent, 1:54-57.

39.     Specifically, the '228 Patent discloses an exemplary wearable ring device to be worn on a finger of a user including "an external housing," "an internal housing," "a curved battery," "a printed circuit board," "one or more processors," "an accelerometer, a gyroscope, or both," "a temperature sensor," "a first light emitting diode (LED)," "a second LED" that all work in conjunction to provide a wearable ring device. Further, the curved battery is at least partially enclosed within the external housing and the internal housing and fits within a curved portion of the housing. The printed circuit board is also at least partially enclosed by the housing. The one or more components (*e.g.*, the temperature sensor, first LED, second LED, light sensors, and accelerometer, gyroscope, or both) are electrically coupled to the printed circuit board, one or more processors, and the curved battery. Additionally, the one or more processors are individually or in combination capable of processing data from the one or more components and analyze the one or more visible light, infrared light, or near-infrared light to support measurement of a blood oxygenation level of the user. An exemplary configuration is shown below in Figures 3B and 4 of the '228 Patent:



*302*

TEMPERATURE
SENSOR
*320a*

RED
LED
*320b*

LIGHT
SENSOR
*320c*

IR
LED
*320d*

## FIG. 3B



412
HOUSING (e.g., METAL
INJECTION MOLDED (MIM))

400

410

BATTERY (e.g., 10 maH)
480

415

415
FLEX CIRCUIT
(FORMED)

40.     Defendants have directly infringed one or more claims of the '228 Patent in this District and elsewhere in Texas, including at least claim 18 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its smart ring technology, including at least Defendants' products having materially similar configurations to a wearable smart ring device.

41.     For example, Defendants have literally and/or under the doctrine of equivalents directly infringed at least claim 18 of the '228 Patent in this District and elsewhere in Texas by or through making, using, importing, offering for sale and/or selling at least the following: Ultrahuman Ring AIR, and other Ultrahuman devices with the ability to be a finger-worn wearable ring device (collectively, "the '228 Accused Products"). *See* https://www.ultrahuman.com/ring/buy/us/. Oura reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '228 Accused Products are identified to describe Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

42.     Each of the '228 Accused Products is observed to be a wearable ring device intended to be worn on a finger of the user. For example, each of the '228 Accused Products is observed to be a smart ring wearable device. Each of the '228 Accused Products is observed to include a housing including an external housing of metallic material having an exterior surface, interior surface, first flange, and second flange where the internal surface and flanges at least partially enclose an internal space of the external housing. For example, the '228 Accused Products include an outer shell of titanium reinforced with tungsten carbide carbon coating. The '228 Accused Products are further observed to include an internal housing, such as an inner coated with

medical-grade epoxy resin, coupled together with the external housing. Each of the '228 Accused Products is further observed to at least partially enclose a curved battery fitting within a curved portion of the housing, a printed circuit board, one or more components, and one or more processors, where the internal housing contacts the user when the wearable ring is worn. Additionally, each of the '228 Accused Products is observed to include one or more components electrically coupled with the printed circuit board, curved battery, and one or more processors. For example, the '228 Accused Products include a six-axis motion senor to detect a user's physical movement, a temperature sensor to detect a user's skin temperature, red LEDs, green LEDs, Infrared LEDs, and an Infrared Photoplethysmography (PPG) sensor to emit visible and infrared or near-infrared light used to measure the user's blood oxygenation level. It is further observed that each of the '228 Accused Products uses one or more processors to process data acquired from the multiple components and to analyze the visible light, infrared light, or near-infrared light to identify wavelengths of light absorbed by the blood of a user to measure a blood oxygenation level of the user. For example, each of the '228 Accused Products can provide users with various biometric data, including a user's temperature, blood oxygenation, and physical movement. *See, e.g.*, https://www.ultrahuman.com/ring/buy/us/.

43.    As shown below, images of exemplary '228 Accused Products, including the Ultrahuman Ring AIR, provide non-limiting examples of the '228 Accused Products infringing at least claim 18 of the '228 Patent by including "an external housing," "an internal housing," "a curved battery," "a printed circuit board," "one or more processors," and "one or more components," such as "a temperature sensor," "a first LED," "a second LED," "one or more light sensors," and "an accelerometer, a gyroscope, or both" as claimed in the '228 Patent:





Images of an exemplary size 5 Matt Grey Ultrahuman Ring AIR







Images of an exemplary size 9 Raw Titanium Ultrahuman Ring AIR




 

Images of an exemplary size 14 Raw Titanium Ultrahuman Ring AIR

44.    Similarly, the following excerpts from Ultrahuman's websites provides non-limiting examples of the '228 Accused Products infringing at least claim 18 of the '228 Patent:





Equipped with a **PPG sensor**, the Ultrahuman Ring AIR empowers you to stay on top of your body's vitals such as heart rate, heart rate variability, blood oxygen saturation and more.



Armed with a **6-axis motion sensor**, it captures the intricacies of your body's movements with unmatched precision. Accompanied by a non-contact temperature sensor to effortlessly monitor your body temperature.



Precision casted with a **hypoallergenic smooth inner shell**, Ring AIR curates an unmatched comfort level, enhancing your tranquillity during sleep and rest.



# Strong from the outside

Robustness of **Fighter Jet Grade Titanium** reinforced with **Tungsten Carbide Carbon** coating for unmatched resilience.

 

https://www.ultrahuman.com/

 



TEMPERATURE

## Early indicators with temperature metrics



THE HRV FACTOR

## Continuous HRV monitoring









| | Ultrahuman Ring |
|---|---|
| **Recovery** | |
| HRV Monitoring | **Dynamic Recovery tracking via SDNN, RMSSD metrics** |
| Stress Monitoring | ✓ |
| **Function** | |
| Battery Life | **4 to 6 days** |
| Full Charging Time | **180 minutes** |
| Water Proof | **Up to 100 meters (about 328 feet) for up to 12 hours** |

| | Ultrahuman Ring |
|---|---|
| **Movement & Workout** | |
| Step Counting | ✓ |
| Distance and Calories | ✓ |
| VO2 Max | ✓ |

| | Ultrahuman Ring |
|---|---|
| Form Factor | **Ring no display** |
| Circadian Rhythm Tracking | ✓ |
| Temperature-Based Ovulation Prediction | ✓ |
| Caffeine Window Detection | ✓ |
| AFib Detection | ✓ (limited regions) |





# Technical Specifications

 

| Body | Dimensions | | Weight |
|---|---|---|---|
| | Width - 8.1mm | | 2.4 - 3.6 g (varies with size) |
| | Thickness - 2.45 - 2.8 mm (varies with size) | | |

| Material | The outer shell is made from fighter jet grade Titanium reinforced with Tungsten Carbide Carbon coating, making it resistant to everyday wear and tear |
|---|---|
| | The inners of the ring is coated with medical-grade hypoallergenic epoxy resin, making it comfortable to wear at all times |

### Sensors

Infrared Photoplethysmography (PPG) sensor

Non-contact medical-grade skin temperature sensor

6-axis motion sensors

Red LEDs (heart rate monitoring and oxygen saturation)

Green LEDs (heart rate monitoring)

Infrared LEDs (heart rate monitoring)

### Battery

Rechargeable, non-replaceable 24mAh LiPo battery

Lasts 4 to 6 days on a full charge

180 mins to fully charge the Ring from 0% to 100%

https://www.ultrahuman.com/ring/buy/us/

| | |
|---|---|
| **Which finger is optimal for wearing the ring?** | We suggest wearing the ring on your index, middle, or ring finger. The ultimate choice among these depends on which finger provides the most comfortable fit or aligns with your personal preference. Here's a more detailed guide to determining the right ring size. |
| **What is Ultrahuman Ring AIR made of?** | The Ultrahuman Ring AIR is meticulously crafted from durable titanium and further reinforced with a tungsten carbide coating, augmenting its resilience for everyday activities. |
| **How does the ring capture and measure body signals?** | The Ultrahuman Ring AIR employs an array of sensors, including a temperature sensor, a PPG (photoplethysmography) sensor, and a motion-sensing IMU (inertial measurement unit). By capturing signals from your finger, these sensors enable the ring to collect vital data. These signals are then processed using advanced algorithms, developed by Ultrahuman, to provide you with profound metabolic insights and a comprehensive understanding of your body's dynamics. |
| **What is Heart Rate Variability (HRV)?** | Heart Rate Variability, commonly abbreviated as HRV, refers to the extent of fluctuation or variation in your heart rate over a specific timeframe. HRV serves as a valuable metric for assessing physical well-being, including heart conditions, as well as mental health factors such as anxiety and stress levels. Generally, a higher HRV is regarded as an indication of better overall health. |
| **What specific parameters can the ring monitor?** | The Ring AIR is capable of tracking a comprehensive range of metrics associated with Sleep, Movement, and Recovery. This includes Heart Rate, HRV, Body Temperature, SPO2, Sleep Stages, Movement Frequency, and Recovery patterns, among others. Additionally, it offers real-time insights designed to guide you towards making healthier daily decisions. These metrics are also seamlessly integrated with the broader Ultrahuman ecosystem of products, such as the Ultrahuman M1. |
| **What distinguishes the Ring AIR from the Ring (R1)?** | The Ultrahuman Ring AIR exemplifies an evolution in design and user experience. With a svelte profile at only 2.4 mm thick, the AIR offers unmatched comfort and wearability. The Ring AIR remains impressively lightweight at just 2.4 grams*. It achieves this without compromising on the suite of features, accuracy, or battery life that is appreciated in the R1 model.<br><br>*\*The weight specification is provided with reference to well-known and globally recognized smart rings currently available on the market.\** |
| **What safety considerations have been incorporated into the design and construction of the ring?** | The Ultrahuman team prioritizes the safety and comfort of users in the design and engineering of their products. The Ultrahuman Rings have been meticulously crafted with user comfort in mind. The inner side of the rings features a transparent hypoallergenic plastic-based material that comes into contact with your skin, ensuring a comfortable experience. Additionally, the outer shell of the ring is constructed from Titanium, chosen for its durability and longevity. Titanium provides the necessary strength and resistance to deformation.<br><br>In rare and exceptional circumstances, should the need arise, any Ultrahuman Ring can be safely removed using either manual or power ring cutters, ensuring the wearer's well-being. |

https://www.ultrahuman.com/ring/faq/

45.    The foregoing features of the '228 Accused Products and Ultrahuman's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 18 of the '228 Patent, under 35 U.S.C. § 271(a).

46.    Defendants have indirectly infringed at least claim 18 of the '228 Patent in this District and elsewhere in the United States by, among other things, actively inducing the use,

offering for sale, selling, or importation of at least the '228 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '228 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides or websites, such as those located at: https://www.ultrahuman.com/; https://www.ultrahuman.com/ring/buy/us/;                     https://www.ultrahuman.com/ring/faq/; https://blog.ultrahuman.com/blog/;      https://blog.ultrahuman.com/blog/getting-started-with-the-ultrahuman-ring-onboarding-guide/;                     and                     https://m.media-amazon.com/images/I/B16CaytYUfL.pdf?ref=dp_product_quick_view.

47.    For example, as shown above Defendants instruct their customers that the Ultrahuman Ring AIR "accurately tracks sleep, HRV, temperature, and movement with daily actionable health insights" and instruct customers to wear the '228 Accused Products on their finger because "[t]he finger, with its higher perfusion index and arterioles, serves as a richer and more accurate source of biomarker information" compared to the wrist. *See* https://www.ultrahuman.com/.

48.    Defendants are thereby liable for infringement of the '228 Patent pursuant to 35 U.S.C. § 271(b).

49.    Defendants have indirectly infringed at least claim 18 of the '228 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '228 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be

28

especially made or especially adapted for use in infringement of the '228 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

50.     For example, the '228 Accused Products include hardware and software for implementing health tracking functionality in a smart ring wearable, including a curved battery, processors, housings, sensors, and a printed circuit board. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, these components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '228 Patent pursuant to 35 U.S.C. § 271(c).

51.     Defendants have been on notice of the '228 Patent since, at least, the filing of this Complaint. By the time of trial, Defendants will thus have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 18 of the '228 Patent.

52.     Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '228 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this Complaint, Defendants have been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '228 Patent, and that the '228 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '228 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants continued their infringing activities. As such, Defendants have willfully infringed and continues to willfully infringe the '228 Patent.

53.     Oura has been and continues to be damaged by Defendants' infringement of the '228 Patent.

## COUNT 2 - INFRINGEMENT OF U.S. PATENT NO. 12,393,229

54.     Oura incorporates paragraphs 1-53 above by reference.

55.     U.S. Patent No. 12,393,229 (the "'229 Patent," attached hereto at Exhibit 6) duly issued on August 19, 2025, and is entitled *Wearable Computing Device*.

56.     Oura is the owner by assignment of the '229 Patent and possesses all rights under the '229 Patent, including the exclusive right to recover for past and future infringement.

57.     The '229 Patent is directed to a wearable ring device including, for example, a wearable ring device configured to be worn on a finger of a user. In particular, the apparatus disclosed in the '229 Patent ensure that a user can track their physical movement, skin temperature, heart rate, and blood oxygenation levels from sensing data obtained from the wearable ring device.

58.     Specifically, the '229 Patent discloses an exemplary wearable ring device to be worn on a finger of a user including "an external housing," "an internal housing," "a curved battery," "a printed circuit board," "one or more processors," "an accelerometer," "a temperature sensor," "a first light emitting diode (LED)," "a second LED" that all work in conjunction to provide a wearable ring device. Further, the curved battery is at least partially enclosed within the external housing and the internal housing and fits within a curved portion of the housing. The printed circuit board is also at least partially enclosed by the housing. The one or more components (*e.g.*, the temperature sensor, first LED, second LED, light sensors, and accelerometer) are electrically coupled to the printed circuit board, one or more processors, and the curved battery. Additionally, the one or more processors are individually or in combination capable of processing data from the one or more components and analyze the one or more visible light, infrared light, or

near-infrared light to support measurement of a blood oxygenation level of the user. An exemplary

configuration is shown below in Figures 3B and 4 of the '229 Patent.



FIG. 3B



FIG.4

59.     Defendants have directly infringed one or more claims of the '229 Patent in this

District and elsewhere in Texas, including at least claim 1 literally and/or under the doctrine of

31

equivalents, by or through making, using, importing, offering for sale and/or selling its smart ring technology, including at least Defendants' products having materially similar configurations to a wearable ring device.

60.    For example, Defendants have literally and/or under the doctrine of equivalents directly infringed at least claim 1 of the '229 Patent in this District and elsewhere in Texas by or through making, using, importing, offering for sale and/or selling at least the following: Ultrahuman Ring AIR, and other Ultrahuman devices with the ability to be a finger-worn wearable ring device (collectively, "the '229 Accused Products"). *See* https://www.ultrahuman.com/ring/buy/us/. Oura reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '229 Accused Products are identified to describe Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

61.    Each of the '229 Accused Products is observed to be a wearable ring device intended to be worn on a finger of the user. For example, each of the '229 Accused Products is observed to be a smart ring wearable device. Each of the '229 Accused Products is observed to include a housing including an external housing having an exterior surface, an internal housing having an interior surface, where the external housing and internal housing form a housing. For example, the '229 Accused Products include an outer shell of titanium reinforced with tungsten carbide carbon coating. The '229 Accused Products are further observed to include an internal housing, such as an inner coated with medical-grade epoxy resin, which together form a housing. Each of the '229 Accused Products is further observed to include the housing that encloses a curved battery, a printed circuit board, one or more components, and one or more processors, where the

internal housing contacts the user when the wearable ring is worn. Additionally, each of the '229 Accused Products is observed to include one or more components electrically coupled with the printed circuit board, curved battery, and one or more processors. For example, the '229 Accused Products include a six-axis motion senor to detect a user's physical movement, a temperature sensor to detect a user's skin temperature, red LEDs, green LEDs, Infrared LEDs, and an Infrared Photoplethysmography (PPG) senor to emit visible and infrared or near-infrared light used to measure the user's blood oxygenation level. It is further observed that each of the '229 Accused Products uses one or more processors to analyze the visible light, infrared light, or near-infrared light to identify wavelengths of light absorbed by the blood of a user to measure a blood oxygenation level of the user. For example, each of the '229 Accused Products can provide users with various biometric data, including a user's temperature, blood oxygenation, and physical movement. *See, e.g.*, https://www.ultrahuman.com/ring/buy/us/.

62.    As shown below, images of exemplary '229 Accused Products, including the Ultrahuman Ring AIR, provide non-limiting examples of the '229 Accused Products infringing at least claim 1 of the '229 Patent by including "an external housing," "an internal housing," "a curved battery," "a printed circuit board," "one or more processors," and "one or more components," such as "a temperature sensor," "a first LED," "a second LED," "one or more light sensors," and "an accelerometer" as claimed in the '229 Patent:






Images of an exemplary size 5 Matt Grey Ultrahuman Ring AIR







Images of an exemplary size 9 Raw Titanium Ultrahuman Ring AIR




 

Images of an exemplary size 14 Raw Titanium Ultrahuman Ring AIR

63.     Similarly, the following excerpts from Ultrahuman's websites provide non-limiting examples of the '229 Accused Products infringing at least claim 1 of the '229 Patent:





Equipped with a **PPG sensor**, the Ultrahuman Ring AIR empowers you to stay on top of your body's vitals such as heart rate, heart rate variability, blood oxygen saturation and more.



Armed with a **6-axis motion sensor**, it captures the intricacies of your body's movements with unmatched precision. Accompanied by a non-contact temperature sensor to effortlessly monitor your body temperature.



Precision casted with a **hypoallergenic smooth inner shell**, Ring AIR curates an unmatched comfort level, enhancing your tranquillity during sleep and rest.



# Strong from the outside

Robustness of **Fighter Jet Grade Titanium** reinforced with **Tungsten Carbide Carbon** coating for unmatched resilience.

 

https://www.ultrahuman.com/



TEMPERATURE

## Early indicators with temperature metrics



This marker evaluates the variations in your Skin Temperature, and can serve as an early indicator of the body's reaction to stress, infection, inflammation or any other physiological changes. By constantly monitoring these fluctuations in real time, the Skin Temperature enables you to detect potential health concerns, and make informed decisions for well being.

THE HRV FACTOR

## Continuous HRV monitoring

Ring AIR's adaptive **real-time HRV (Heart Rate Variability)** monitoring measures the time between heartbeats. By tracking HRV continuously, you can identify periods of high stress or low recovery capacity, enabling informed lifestyle and stress management decisions.

Similarly, RHR (Resting Heart Rate), assesses an individual's average heart rate while at rest. It offers valuable insights into your cardiovascular health, fitness levels and overall well being. By consistently monitoring the RHR you can track their progress, identify trends or irregularities, and make informed decisions to improve your cardiovascular function and overall fitness.

IMPACT OF STRESS

## Regulate Stress with your body's natural rhythm



**Ultrahuman Ring**

| | Ultrahuman Ring |
|---|---|
| Heart Rate Monitoring | **Periodically** throughout the day |
| HRV Monitoring | **24/7 HRV monitoring** Dynamic and actionable |
| Skin Temperature Tracking | **24/7** temperature monitoring |
| **Sleep** | |
| Sleep Tracking | ✓ |
| Sleep Metrics | **Comprehensive Sleep Stages Tracking with 10+ Contributing Metrics** |

**Ultrahuman Ring**

| | Ultrahuman Ring |
|---|---|
| **Form** | |
| Weight | **2.4 - 3.6 grams** (varies by size) Feels as heavy as a US penny |
| Form Factor | **Ring** no display |



| | Ultrahuman Ring |
|---|---|
| **Recovery** | |
| HRV Monitoring | Dynamic Recovery tracking via SDNN, RMSSD metrics |
| Stress Monitoring | ✓ |
| **Function** | |
| Battery Life | 4 to 6 days |
| Full Charging Time | 180 minutes |
| Water Proof | Up to 100 meters (about 328 feet) for up to 12 hours |

| | Ultrahuman Ring |
|---|---|
| **Movement & Workout** | |
| Step Counting | ✓ |
| Distance and Calories | ✓ |
| VO2 Max | ✓ |

| | Ultrahuman Ring |
|---|---|
| Form Factor | Ring no display |
| Circadian Rhythm Tracking | ✓ |
| Temperature-Based Ovulation Prediction | ✓ |
| Caffeine Window Detection | ✓ |
| AFib Detection | ✓ (limited regions) |







# Technical Specifications

 

| Body | Dimensions | | Weight |
|---|---|---|---|
| | Width - 8.1mm | | 2.4 - 3.6 g (varies with size) |
| | Thickness - 2.45 - 2.8 mm (varies with size) | | |

| Material | The outer shell is made from fighter jet grade Titanium reinforced with Tungsten Carbide Carbon coating, making it resistant to everyday wear and tear |
|---|---|
| | The inners of the ring is coated with medical-grade hypoallergenic epoxy resin, making it comfortable to wear at all times |

**Sensors**

Infrared Photoplethysmography (PPG) sensor

Non-contact medical-grade skin temperature sensor

6-axis motion sensors

Red LEDs (heart rate monitoring and oxygen saturation)

Green LEDs (heart rate monitoring)

Infrared LEDs (heart rate monitoring)

**Battery**

Rechargeable, non-replaceable 24mAh LiPo battery

Lasts 4 to 6 days on a full charge

180 mins to fully charge the Ring from 0% to 100%

https://www.ultrahuman.com/ring/buy/us/

| | |
|---|---|
| **Which finger is optimal for wearing the ring?** | We suggest wearing the ring on your index, middle, or ring finger. The ultimate choice among these depends on which finger provides the most comfortable fit or aligns with your personal preference. Here's a more detailed guide to determining the right ring size. |
| **What is Ultrahuman Ring AIR made of?** | The Ultrahuman Ring AIR is meticulously crafted from durable titanium and further reinforced with a tungsten carbide coating, augmenting its resilience for everyday activities. |
| **How does the ring capture and measure body signals?** | The Ultrahuman Ring AIR employs an array of sensors, including a temperature sensor, a PPG (photoplethysmography) sensor, and a motion-sensing IMU (inertial measurement unit). By capturing signals from your finger, these sensors enable the ring to collect vital data. These signals are then processed using advanced algorithms, developed by Ultrahuman, to provide you with profound metabolic insights and a comprehensive understanding of your body's dynamics. |
| **What is Heart Rate Variability (HRV)?** | Heart Rate Variability, commonly abbreviated as HRV, refers to the extent of fluctuation or variation in your heart rate over a specific timeframe. HRV serves as a valuable metric for assessing physical well-being, including heart conditions, as well as mental health factors such as anxiety and stress levels. Generally, a higher HRV is regarded as an indication of better overall health. |
| **What specific parameters can the ring monitor?** | The Ring AIR is capable of tracking a comprehensive range of metrics associated with Sleep, Movement, and Recovery. This includes Heart Rate, HRV, Body Temperature, SPO2, Sleep Stages, Movement Frequency, and Recovery patterns, among others. Additionally, it offers real-time insights designed to guide you towards making healthier daily decisions. These metrics are also seamlessly integrated with the broader Ultrahuman ecosystem of products, such as the Ultrahuman M1. |
| **What distinguishes the Ring AIR from the Ring (R1)?** | The Ultrahuman Ring AIR exemplifies an evolution in design and user experience. With a svelte profile at only 2.4 mm thick, the AIR offers unmatched comfort and wearability. The Ring AIR remains impressively lightweight at just 2.4 grams*. It achieves this without compromising on the suite of features, accuracy, or battery life that is appreciated in the R1 model. *The weight specification is provided with reference to well-known and globally recognized smart rings currently available on the market.* |
| **What safety considerations have been incorporated into the design and construction of the ring?** | The Ultrahuman team prioritizes the safety and comfort of users in the design and engineering of their products. The Ultrahuman Rings have been meticulously crafted with user comfort in mind. The inner side of the rings features a transparent hypoallergenic plastic-based material that comes into contact with your skin, ensuring a comfortable experience. Additionally, the outer shell of the ring is constructed from Titanium, chosen for its durability and longevity. Titanium provides the necessary strength and resistance to deformation. In rare and exceptional circumstances, should the need arise, any Ultrahuman Ring can be safely removed using either manual or power ring cutters, ensuring the wearer's well-being. |

https://www.ultrahuman.com/ring/faq/

64.     The foregoing features of the '229 Accused Products and Ultrahuman's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 1 of the '229 Patent, under 35 U.S.C. § 271(a).

65.     Defendants have indirectly infringed at least claim 1 of the '229 Patent in this District and elsewhere in the United States by, among other things, actively inducing the use,

offering for sale, selling, or importation of at least the '229 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '229 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides or websites, such as those located at: https://www.ultrahuman.com/; https://www.ultrahuman.com/ring/buy/us/;                       https://www.ultrahuman.com/ring/faq/; https://blog.ultrahuman.com/blog/;      https://blog.ultrahuman.com/blog/getting-started-with-the-ultrahuman-ring-onboarding-guide/;                    and                    https://m.media-amazon.com/images/I/B16CaytYUfL.pdf?ref=dp_product_quick_view.

66.     For example, as shown above Defendants instruct their customers that the Ultrahuman Ring AIR "accurately tracks sleep, HRV, temperature, and movement with daily actionable health insights" and instruct customers to wear the '229 Accused Products on their finger because "[t]he finger, with its higher perfusion index and arterioles, serves as a richer and more accurate source of biomarker information" compared to the wrist. *See* https://www.ultrahuman.com/.

67.     Defendants are thereby liable for infringement of the '229 Patent pursuant to 35 U.S.C. § 271(b).

68.     Defendants have indirectly infringed at least claim 1 of the '229 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '229 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be

especially made or especially adapted for use in infringement of the '229 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

69.    For example, the '229 Accused Products include hardware and software for implementing health tracking functionality in a smart ring wearable, including a curved battery, processors, housings, sensors, and a printed circuit board. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, these components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '229 Patent pursuant to 35 U.S.C. § 271(c).

70.    Defendants have been on notice of the '229 Patent since, at least, the filing of this Complaint. By the time of trial, Defendants will thus have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 1 of the '229 Patent.

71.    Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '229 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this Complaint, Defendants have been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '229 Patent, and that the '229 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '229 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants continued their infringing activities. As such, Defendants have willfully infringed and continues to willfully infringe the '229 Patent.

72.    Oura has been and continues to be damaged by Defendants' infringement of the '229 Patent.

## COUNT 3 - INFRINGEMENT OF U.S. PATENT NO. 12,399,530

73.    Oura incorporates paragraphs 1-72 above by reference.

74.    U.S. Patent No. 12,399,530 (the "'530 Patent," attached hereto as Exhibit 7) duly issued on August 26, 2025, and is entitled *Wearable Computing Device*.

75.    Oura is the owner by assignment of the '530 Patent and possesses all rights under the '530 Patent, including the exclusive right to recover for past and future infringement.

76.    The '530 Patent is directed to a finger-worn wearable ring device. In particular, the apparatus disclosed in the '530 Patent ensures the inclusion of a curved battery, printed circuit board, temperature sensor, first light emitting diode (LED), second LED, and an accelerometer, between an internal and external housing of a wearable ring device. Further, the apparatus disclosed in the '530 Patent provides "a wearable computing device [that] can be worn for extended periods of time and can take many measurements and perform various functions because of its form factor and position on the finger of a user." '530 Patent, 1:54-57.

77.    Specifically, the '530 Patent discloses an exemplary wearable ring device to be worn on a finger of a user including "an external housing," "an internal potting," "a curved battery," "a printed circuit board," "an accelerometer," "a temperature sensor," "a first light emitting diode (LED)," "a second LED" that all work in conjunction to provide a wearable ring device. Further, the curved battery is at least partially surrounded within the external housing and the internal housing and fits within a curved portion of the housing. The printed circuit board is also at least partially surrounded by the housing. The one or more components (*e.g.*, the temperature sensor, first LED, second LED, light sensors, and accelerometer) are electrically

coupled to the printed circuit board and the curved battery. Additionally, the first LED emits visible

light and the second LED emits at least one of infrared light or near-infrared light and are both

positions within the housing and emit light through the internal potting toward the use to measure

a heat rate and blood oxygenation level of the user. An exemplary configuration is shown below

in Figures 3B, 4, and 12D of the '530 Patent.



FIG. 3B



FIG.4



FIG. 12D

78.     Defendants have directly infringed one or more claims of the '530 Patent in this District and elsewhere in Texas, including at least claim 18 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its smart ring technology, including at least Defendants' products having materially similar configurations to a wearable smart ring device.

79.     For example, Defendants have literally and/or under the doctrine of equivalents directly infringed at least claim 18 of the '530 Patent in this District and elsewhere in Texas by or through making, using, importing, offering for sale and/or selling at least the following: Ultrahuman Ring AIR, and other Ultrahuman devices with the ability to be a finger-worn wearable ring device (collectively, "the '530 Accused Products"). *See* https://www.ultrahuman.com/ring/buy/us/. Oura reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '530 Accused Products are identified to describe Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

80.     Each of the '530 Accused Products is observed to be a wearable ring device intended to be worn on a finger of the user. For example, each of the '530 Accused Products is observed to be a smart ring wearable device. Each of the '530 Accused Products is observed to include a housing including an external housing of metallic material having an exterior surface, interior surface, first flange, and second flange where the internal surface and flanges at least partially enclose an internal space of the external housing. For example, the '530 Accused Products include an outer shell of titanium reinforced with tungsten carbide carbon coating. The '530 Accused Products are further observed to include an internal potting that at least partially fills the internal space of the external housing. Each of the '530 Accused Products is further observed to at least partially surrounds a curved battery fitting within a curved portion of the housing, a printed circuit board, and one or more components, where at least a layer of the internal potting has an interior surface that contacts the user when the wearable ring is worn. Additionally, each of the '530 Accused Products is observed to include one or more components electrically coupled with

the printed circuit board and curved battery. For example, the '530 Accused Products include a six-axis motion senor to detect a user's physical movement, a temperature sensor to detect a user's skin temperature, red LEDs, green LEDs, Infrared LEDs, and an Infrared Photoplethysmography (PPG) senor to emit visible and infrared or near-infrared light used to measure the user's blood oxygenation level and heart rate. For example, each of the '530 Accused Products can provide users with various biometric data, including a user's physical movement, temperature, heart rate, and blood oxygenation. *See, e.g.*, https://www.ultrahuman.com/ring/buy/us/.

81.     As shown below, images of exemplary '530 Accused Products, including the Ultrahuman Ring AIR, provide non-limiting examples of the '530 Accused Products infringing at least claim 18 of the '530 Patent by including "an external housing," "an internal potting," "a curved battery," "a printed circuit board," and "one or more components," such as "a temperature sensor," "a first LED," "a second LED," "one or more light sensors," and "an accelerometer" as claimed in the '530 Patent:

 



Images of an exemplary size 5 Matt Grey Ultrahuman Ring AIR

 




Images of an exemplary size 9 Raw Titanium Ultrahuman Ring AIR







Images of an exemplary size 14 Raw Titanium Ultrahuman Ring AIR

82.    Similarly, the following excerpts from Ultrahuman's websites provides non-limiting examples of the '530 Accused Products infringing at least claim 18 of the '530 Patent:





Armed with a **6-axis motion sensor**, it captures the intricacies of your body's movements with unmatched precision. Accompanied by a non-contact temperature sensor to effortlessly monitor your body temperature.

Precision casted with a **hypoallergenic smooth inner shell**, Ring AIR curates an unmatched comfort level, enhancing your tranquillity during sleep and rest.



 

https://www.ultrahuman.com/

 

58



**TEMPERATURE**

## Early indicators with temperature metrics



THE HRV FACTOR

## Continuous HRV monitoring



IMPACT OF STRESS

## Regulate Stress with your body's natural rhythm





### Ultrahuman Ring

**Form**

| | Ultrahuman Ring |
|---|---|
| Weight | 2.4 - 3.6 grams (varies by size) Feels as heavy as a US penny |
| Form Factor | Ring no display |

### Ultrahuman Ring

**Movement & Workout**

| | |
|---|---|
| Step Counting | ✔ |
| Distance and Calories | ✔ |
| VO2 Max | ✔ |

### Ultrahuman Ring

| Heart Rate Monitoring | **Periodically** throughout the day |
|---|---|
| HRV Monitoring | **24/7 HRV monitoring** Dynamic and actionable |
| Skin Temperature Tracking | **24/7** temperature monitoring |

**Sleep**

| Sleep Tracking | ✔ |
|---|---|
| Sleep Metrics | Comprehensive Sleep Stages Tracking with 10+ Contributing Metrics |

### Ultrahuman Ring

**Recovery**

| HRV Monitoring | Dynamic Recovery tracking via SDNN, RMSSD metrics |
|---|---|
| Stress Monitoring | ✔ |

**Function**

| Battery Life | 4 to 6 days |
|---|---|
| Full Charging Time | 180 minutes |
| Water Proof | Up to 100 meters (about 328 feet) for up to 12 hours |

61

|  | Ultrahuman Ring |
| --- | --- |
| Form Factor |  Ring no display |
| Circadian Rhythm Tracking | ✓ |
| Temperature-Based Ovulation Prediction | ✓ |
| Caffeine Window Detection | ✓ |
| AFib Detection | ✓ (limited regions) |







# Technical Specifications



| Body | Dimensions | | Weight |
|---|---|---|---|
| | Width - 8.1mm | | 2.4 - 3.6 g (varies with size) |
| | Thickness - 2.45 - 2.8 mm (varies with size) | | |

| Material | The outer shell is made from fighter jet grade Titanium reinforced with Tungsten Carbide Carbon coating, making it resistant to everyday wear and tear |
|---|---|
| | The inners of the ring is coated with medical-grade hypoallergenic epoxy resin, making it comfortable to wear at all times |

### Sensors

Infrared Photoplethysmography (PPG) sensor

Non-contact medical-grade skin temperature sensor

6-axis motion sensors

Red LEDs (heart rate monitoring and oxygen saturation)

Green LEDs (heart rate monitoring)

Infrared LEDs (heart rate monitoring)

### Battery

Rechargeable, non-replaceable 24mAh LiPo battery

Lasts 4 to 6 days on a full charge

180 mins to fully charge the Ring from 0% to 100%

https://www.ultrahuman.com/ring/buy/us/

**Which finger is optimal for wearing the ring?**

We suggest wearing the ring on your index, middle, or ring finger. The ultimate choice among these depends on which finger provides the most comfortable fit or aligns with your personal preference. Here's a more detailed guide to determining the right ring size.

**What is Ultrahuman Ring AIR made of?**

The Ultrahuman Ring AIR is meticulously crafted from durable titanium and further reinforced with a tungsten carbide coating, augmenting its resilience for everyday activities.

**How does the ring capture and measure body signals?**

The Ultrahuman Ring AIR employs an array of sensors, including a temperature sensor, a PPG (photoplethysmography) sensor, and a motion-sensing IMU (inertial measurement unit). By capturing signals from your finger, these sensors enable the ring to collect vital data. These signals are then processed using advanced algorithms, developed by Ultrahuman, to provide you with profound metabolic insights and a comprehensive understanding of your body's dynamics.

**What is Heart Rate Variability (HRV)?**

Heart Rate Variability, commonly abbreviated as HRV, refers to the extent of fluctuation or variation in your heart rate over a specific timeframe. HRV serves as a valuable metric for assessing physical well-being, including heart conditions, as well as mental health factors such as anxiety and stress levels. Generally, a higher HRV is regarded as an indication of better overall health.

**What specific parameters can the ring monitor?**

The Ring AIR is capable of tracking a comprehensive range of metrics associated with Sleep, Movement, and Recovery. This includes Heart Rate, HRV, Body Temperature, SPO2, Sleep Stages, Movement Frequency, and Recovery patterns, among others. Additionally, it offers real-time insights designed to guide you towards living healthier daily decisions. These metrics are also seamlessly integrated with the broader Ultrahuman ecosystem of products, such as the Ultrahuman M1.

| What distinguishes the Ring AIR from the Ring (R1)? | The Ultrahuman Ring AIR exemplifies an evolution in design and user experience. With a svelte profile at only 2.4 mm thick, the AIR offers unmatched comfort and wearability. The Ring AIR remains impressively lightweight at just 2.4 grams*. It achieves this without compromising on the suite of features, accuracy, or battery life that is appreciated in the R1 model. |
| | **The weight specification is provided with reference to well-known and globally recognized smart rings currently available on the market.* |
| What safety considerations have been incorporated into the design and construction of the ring? | The Ultrahuman team prioritizes the safety and comfort of users in the design and engineering of their products. The Ultrahuman Rings have been meticulously crafted with user comfort in mind. The inner side of the rings features a transparent hypoallergenic plastic-based material that comes into contact with your skin, ensuring a comfortable experience. Additionally, the outer shell of the ring is constructed from Titanium, chosen for its durability and longevity. Titanium provides the necessary strength and resistance to deformation. |
| | In rare and exceptional circumstances, should the need arise, any Ultrahuman Ring can be safely removed using either manual or power ring cutters, ensuring the wearer's well-being. |

https://www.ultrahuman.com/ring/faq/

83. The foregoing features of the '530 Accused Products and Ultrahuman's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 18 of the '530 Patent, under 35 U.S.C. § 271(a).

84. Defendants have indirectly infringed at least claim 18 of the '530 Patent in this District and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '530 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '530 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides or websites, such as those located at: https://www.ultrahuman.com/; https://www.ultrahuman.com/ring/buy/us/; https://www.ultrahuman.com/ring/faq/; https://blog.ultrahuman.com/blog/; https://blog.ultrahuman.com/blog/getting-started-with-the-ultrahuman-ring-onboarding-guide/; and https://m.media-amazon.com/images/I/B16CaytYUfL.pdf?ref=dp_product_quick_view.

85.    For example, as shown above Defendants instruct their customers that the Ultrahuman Ring AIR "accurately tracks sleep, HRV, temperature, and movement with daily actionable health insights" and instruct customers to wear the '530 Accused Products on their finger because "[t]he finger, with its higher perfusion index and arterioles, serves as a richer and more accurate source of biomarker information" compared to the wrist. *See* https://www.ultrahuman.com/.

86.    Defendants are thereby liable for infringement of the '530 Patent pursuant to 35 U.S.C. § 271(b).

87.    Defendants have indirectly infringed at least claim 18 of the '530 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '530 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '530 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

88.    For example, the '530 Accused Products include hardware and software for implementing health tracking functionality in a smart ring wearable, including a curved battery, housing, potting, sensors, and a printed circuit board. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, these components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '530 Patent pursuant to 35 U.S.C. § 271(c).

89.    Defendants have been on notice of the '530 Patent since, at least, the filing of this Complaint. By the time of trial, Defendants will thus have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 18 of the '530 Patent.

90.    Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '530 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this Complaint, Defendants have been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '530 Patent, and that the '530 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '530 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants continued their infringing activities. As such, Defendants have willfully infringed and continues to willfully infringe the '530 Patent.

91.    Oura has been and continues to be damaged by Defendants' infringement of the '530 Patent.

## COUNT 4 - INFRINGEMENT OF U.S. PATENT NO. 12,399,531

92.    Oura incorporates paragraphs 1-91 above by reference.

93.    U.S. Patent No. 12,399,531 (the "'531 Patent," attached hereto as Exhibit 8) duly issued on August 26, 2025, and is entitled *Wearable Computing Device*.

94.    Oura is the owner by assignment of the '531 Patent and possesses all rights under the '531 Patent, including the exclusive right to recover for past and future infringement.

95.    The '531 Patent is directed to a finger-worn wearable ring device. In particular, the apparatus disclosed in the '531 Patent ensures the inclusion of a curved battery, printed circuit board, temperature sensor, first light emitting diode (LED), second LED, and an accelerometer, gyroscope, or both, between a housing of a wearable ring device. Further, the apparatus disclosed in the '531 Patent provides "a wearable computing device [that] can be worn for extended periods of time and can take many measurements and perform various functions because of its form factor and position on the finger of a user." '531 Patent, 1:54-57.

96.    Specifically, the '531 Patent discloses an exemplary wearable ring device to be worn on a finger of a user including "an external housing," "an internal potting," "a curved battery," "a printed circuit board," "an accelerometer, gyroscope, or both," "a temperature sensor," "a first light emitting diode (LED)," "a second LED" that all work in conjunction to provide a wearable ring device. Further, the curved battery is at least partially surrounded within the internal potting and the internal potting at least partially fills the internal space of the external housing. The internal potting adheres to the external housing and the external housing and internal potting together enclose the curved battery, printed circuit board, and one or more components. The one or more components (*e.g.*, the temperature sensor, first LED, second LED, light sensors, and accelerometer, gyroscope, or both) are electrically coupled to the printed circuit board and the curved battery. Additionally, the first LED emits visible light and the second LED emits at least one of infrared light or near-infrared light and are both positions within the housing and emit light through the internal potting toward the use to measure a heat rate and blood oxygenation level of the user. An exemplary configuration is shown below in Figures 3B, 4, and 12D of the '531 Patent.



_302_

TEMPERATURE
SENSOR
_320a_

RED
LED
_320b_

LIGHT
SENSOR
_320c_

IR
LED
_320d_

## FIG. 3B



412
HOUSING (e.g., METAL
INJECTION MOLDED (MIM))

400

410

BATTERY (e.g., 10 maH)
480

415

415
FLEX CIRCUIT
(FORMED)

## FIG.4

70



FIG. 12D

97.    Defendants have directly infringed one or more claims of the '531 Patent in this District and elsewhere in Texas, including at least claim 17 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its smart ring technology, including at least Defendants' products having materially similar configurations to a wearable smart ring device.

98.    For example, Defendants have literally and/or under the doctrine of equivalents directly infringed at least claim 17 of the '531 Patent in this District and elsewhere in Texas by or through making, using, importing, offering for sale and/or selling at least the following: Ultrahuman Ring AIR, and other Ultrahuman devices with the ability to be a finger-worn wearable ring device (collectively, "the '531 Accused Products"). *See* https://www.ultrahuman.com/ring/buy/us/. Oura reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '531 Accused Products are identified to describe Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

99.    Each of the '531 Accused Products is observed to be a wearable ring device intended to be worn on a finger of the user. For example, each of the '531 Accused Products is observed to be a smart ring wearable device. Each of the '531 Accused Products is observed to include a housing including an external housing of metallic material having an exterior surface, interior surface, first flange, and second flange where the internal surface and flanges at least partially enclose an internal space of the external housing. For example, the '531 Accused Products include an outer shell of titanium reinforced with tungsten carbide carbon coating. The '531 Accused Products are further observed to include an internal potting that at least partially fills the internal space of the external housing. Each of the '531 Accused Products is further observed to at least partially surrounds a curved battery with the internal potting, which adheres to the external housing. Further, the '531 Accused Products are observed to enclose the curved battery, a printed circuit board, and one or more components, where at least a layer of the internal potting has an interior surface that contacts the user when the wearable ring is worn. Additionally, each of the '531 Accused Products is observed to include one or more components electrically coupled with the printed circuit board and curved battery. For example, the '531 Accused Products include a six-axis motion senor to detect a user's physical movement, a temperature sensor to detect a user's skin temperature, red LEDs, green LEDs, Infrared LEDs, and an Infrared Photoplethysmography (PPG) senor to emit visible and infrared or near-infrared light used to measure the user's blood oxygenation level and heart rate. For example, each of the '531 Accused Products can provide users with various biometric data, including a user's physical movement, temperature, heart rate, and blood oxygenation. *See, e.g.*, https://www.ultrahuman.com/ring/buy/us/.

100.    As shown below, images of exemplary '531 Accused Products, including the Ultrahuman Ring AIR, provide non-limiting examples of the '531 Accused Products infringing at

least claim 17 of the '531 Patent by including "an external housing," "an internal potting," "a curved battery," "a printed circuit board," and "one or more components," such as "a temperature sensor," "a first LED," "a second LED," "one or more light sensors," and "an accelerometer, gyroscope, or both" as claimed in the '531 Patent:

 



Images of an exemplary size 5 Matt Grey Ultrahuman Ring AIR







Images of an exemplary size 9 Raw Titanium Ultrahuman Ring AIR




 

Images of an exemplary size 14 Raw Titanium Ultrahuman Ring AIR

101.   Similarly, the following excerpts from Ultrahuman's websites provides non-limiting examples of the '531 Accused Products infringing at least claim 17 of the '531 Patent:





Equipped with a **PPG sensor**, the Ultrahuman Ring AIR empowers you to stay on top of your body's vitals such as heart rate, heart rate variability, blood oxygen saturation and more.



Armed with a **6-axis motion sensor**, it captures the intricacies of your body's movements with unmatched precision. Accompanied by a non-contact temperature sensor to effortlessly monitor your body temperature.



Precision casted with a **hypoallergenic smooth inner shell**, Ring AIR curates an unmatched comfort level, enhancing your tranquillity during sleep and rest.



# Strong from the outside

Robustness of **Fighter Jet Grade Titanium** reinforced with **Tungsten Carbide Carbon** coating for unmatched resilience.




https://www.ultrahuman.com/



TEMPERATURE

## Early indicators with temperature metrics



THE HRV FACTOR

## Continuous HRV monitoring



IMPACT OF STRESS

## Regulate Stress with your body's natural rhythm



**Ultrahuman Ring**

| | Ultrahuman Ring |
|---|---|
| Heart Rate Monitoring | **Periodically**<br>throughout the day |
| HRV Monitoring | **24/7 HRV monitoring**<br>Dynamic and actionable |
| Skin Temperature Tracking | **24/7**<br>temperature monitoring |
| **Sleep** | |
| Sleep Tracking | ✓ |
| Sleep Metrics | **Comprehensive Sleep Stages Tracking with 10+ Contributing Metrics** |

**Ultrahuman Ring**

| | |
|---|---|
| **Form** | |
| Weight | 🪙<br>**2.4 - 3.6 grams**<br>(varies by size)<br>Feels as heavy as a US penny |
| Form Factor | 🖐<br>**Ring**<br>no display |



**Ultrahuman Ring**

**Movement & Workout**

| | |
|---|---|
| Step Counting | ✓ |
| Distance and Calories | ✓ |
| VO2 Max | ✓ |

**Ultrahuman Ring**

**Recovery**

| | |
|---|---|
| HRV Monitoring | Dynamic Recovery tracking via SDNN, RMSSD metrics |
| Stress Monitoring | ✓ |

**Function**

| | |
|---|---|
| Battery Life | 4 to 6 days |
| Full Charging Time | 180 minutes |
| Water Proof | Up to 100 meters (about 328 feet) for up to 12 hours |

**Ultrahuman Ring**

| | |
|---|---|
| Form Factor | Ring<br>no display |
| Circadian Rhythm Tracking | ✓ |
| Temperature-Based Ovulation Prediction | ✓ |
| Caffeine Window Detection | ✓ |
| AFib Detection | ✓<br>(limited regions) |









# Technical Specifications

 

| Body | Dimensions | | Weight |
|---|---|---|---|
| | Width - 8.1mm | | 2.4 - 3.6 g (varies with size) |
| | Thickness - 2.45 - 2.8 mm (varies with size) | | |

| Material | The outer shell is made from fighter jet grade Titanium reinforced with Tungsten Carbide Carbon coating, making it resistant to everyday wear and tear |
|---|---|
| | The inners of the ring is coated with medical-grade hypoallergenic epoxy resin, making it comfortable to wear at all times |

| **Sensors** | Infrared Photoplethysmography (PPG) sensor |
|---|---|
| | Non-contact medical-grade skin temperature sensor |
| | 6-axis motion sensors |
| | Red LEDs (heart rate monitoring and oxygen saturation) |
| | Green LEDs (heart rate monitoring) |
| | Infrared LEDs (heart rate monitoring) |

| **Battery** | Rechargeable, non-replaceable 24mAh LiPo battery |
|---|---|
| | Lasts 4 to 6 days on a full charge |
| | 180 mins to fully charge the Ring from 0% to 100% |

https://www.ultrahuman.com/ring/buy/us/

| | |
|---|---|
| **Which finger is optimal for wearing the ring?** | We suggest wearing the ring on your index, middle, or ring finger. The ultimate choice among these depends on which finger provides the most comfortable fit or aligns with your personal preference. Here's a more detailed guide to determining the right ring size. |
| **What is Ultrahuman Ring AIR made of?** | The Ultrahuman Ring AIR is meticulously crafted from durable titanium and further reinforced with a tungsten carbide coating, augmenting its resilience for everyday activities. |
| **How does the ring capture and measure body signals?** | The Ultrahuman Ring AIR employs an array of sensors, including a temperature sensor, a PPG (photoplethysmography) sensor, and a motion-sensing IMU (inertial measurement unit). By capturing signals from your finger, these sensors enable the ring to collect vital data. These signals are then processed using advanced algorithms, developed by Ultrahuman, to provide you with profound metabolic insights and a comprehensive understanding of your body's dynamics. |
| **What is Heart Rate Variability (HRV)?** | Heart Rate Variability, commonly abbreviated as HRV, refers to the extent of fluctuation or variation in your heart rate over a specific timeframe. HRV serves as a valuable metric for assessing physical well-being, including heart conditions, as well as mental health factors such as anxiety and stress levels. Generally, a higher HRV is regarded as an indication of better overall health. |
| **What specific parameters can the ring monitor?** | The Ring AIR is capable of tracking a comprehensive range of metrics associated with Sleep, Movement, and Recovery. This includes Heart Rate, HRV, Body Temperature, SPO2, Sleep Stages, Movement Frequency, and Recovery patterns, among others. Additionally, it offers real-time insights designed to guide you towards making healthier daily decisions. These metrics are also seamlessly integrated with the broader Ultrahuman ecosystem of products, such as the Ultrahuman M1. |
| **What distinguishes the Ring AIR from the Ring (R1)?** | The Ultrahuman Ring AIR exemplifies an evolution in design and user experience. With a svelte profile at only 2.4 mm thick, the AIR offers unmatched comfort and wearability. The Ring AIR remains impressively lightweight at just 2.4 grams*. It achieves this without compromising on the suite of features, accuracy, or battery life that is appreciated in the R1 model. <br><br> *\*The weight specification is provided with reference to well-known and globally recognized smart rings currently available on the market.\** |
| **What safety considerations have been incorporated into the design and construction of the ring?** | The Ultrahuman team prioritizes the safety and comfort of users in the design and engineering of their products. The Ultrahuman Rings have been meticulously crafted with user comfort in mind. The inner side of the rings features a transparent hypoallergenic plastic-based material that comes into contact with your skin, ensuring a comfortable experience. Additionally, the outer shell of the ring is constructed from Titanium, chosen for its durability and longevity. Titanium provides the necessary strength and resistance to deformation. <br><br> In rare and exceptional circumstances, should the need arise, any Ultrahuman Ring can be safely removed using either manual or power ring cutters, ensuring the wearer's well-being. |

https://www.ultrahuman.com/ring/faq/

102.    The foregoing features of the '531 Accused Products and Ultrahuman's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 17 of the '531 Patent, under 35 U.S.C. § 271 (a).

103.    Defendants have indirectly infringed at least claim 17 of the '531 Patent in this District and elsewhere in the United States by, among other things, actively inducing the use,

offering for sale, selling, or importation of at least the '531 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '531 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at least user guides or websites, such as those located at: https://www.ultrahuman.com/; https://www.ultrahuman.com/ring/buy/us/; https://www.ultrahuman.com/ring/faq/; https://blog.ultrahuman.com/blog/; https://blog.ultrahuman.com/blog/getting-started-with-the-ultrahuman-ring-onboarding-guide/; and https://m.media-amazon.com/images/I/B16CaytYUfL.pdf?ref=dp_product_quick_view.

104.   For example, as shown above Defendants instruct their customers that the Ultrahuman Ring AIR "accurately tracks sleep, HRV, temperature, and movement with daily actionable health insights" and instruct customers to wear the '531 Accused Products on their finger because "[t]he finger, with its higher perfusion index and arterioles, serves as a richer and more accurate source of biomarker information" compared to the wrist. *See* https://www.ultrahuman.com/.

105.   Defendants are thereby liable for infringement of the '531 Patent pursuant to 35 U.S.C. § 271(b).

106.   Defendants have indirectly infringed at least claim 17 of the '531 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '531 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be

especially made or especially adapted for use in infringement of the '531 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

107.    For example, the '531 Accused Products include hardware and software for implementing health tracking functionality in a smart ring wearable, including a curved battery, housing, potting, sensors, and a printed circuit board. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, these components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '531 Patent pursuant to 35 U.S.C. § 271(c).

108.    Defendants have been on notice of the '531 Patent since, at least, the filing of this Complaint. By the time of trial, Defendants will thus have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 17 of the '531 Patent.

109.    Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '531 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this Complaint, Defendants have been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '531 Patent, and that the '531 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '531 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants continued their infringing activities. As such, Defendants have willfully infringed and continues to willfully infringe the '531 Patent.

110.    Oura has been and continues to be damaged by Defendants' infringement of the '531 Patent.

## COUNT 5 - INFRINGEMENT OF U.S. PATENT NO. 12,222,759

111.    Oura incorporates paragraphs 1-110 above by reference.

112.    U.S. Patent No. 12,222,759 (the "'759 Patent," attached hereto as Exhibit 9) duly issued on February 11, 2025, and is entitled *Wearable Computing Device*.

113.    Oura is the owner by assignment of the '759 Patent and possesses all rights under the '759 Patent, including the exclusive right to recover for past and future infringement.

114.    The '759 Patent is directed to a finger-worn wearable ring device. In particular, the apparatus disclosed in the '759 Patent ensures the inclusion of a curved battery, printed circuit board, plurality of sensors, one or more light-emitting components, one or more light-receiving components, and a communication module, within a housing of a finger-worn wearable ring device. Further, the apparatus disclosed in the '759 Patent provides "a wearable computing device [that] can be worn for extended periods of time and can take many measurements and perform various functions because of its form factor and position on the finger of a user." '759 Patent, 1:52-55.

115.    Specifically, the '759 Patent discloses an exemplary finger-worn wearable ring device including "a housing," "a curved battery," "a printed circuit board," "a plurality of sensors," "one or more light-emitting components," "one or more light-receiving components," "a communication module" that all work in conjunction to provide a wearable ring device. Further, the curved battery is positioned within a curved portion of the housing. The printed circuit board is also at least partially within the housing. The plurality of sensors are electrically coupled to the printed circuit board and the curved battery and can acquire data from the user to monitor at least

one of physical activity, sleep, or health of the user. Additionally, the one or more light-emitting components emits light associated with two or more wavelengths, including infrared and visible light. The one or more light-receiving components receive the light associated with the two or more wavelengths. Further, the communication module is coupled with the sensors and transmits the data, analysis generated by one or more processors, or both, to a user device. An exemplary configuration is shown below in Figures 3A, 3B, 4, and 12D of the '759 Patent.



FIG. 3A



TEMPERATURE SENSOR *320a*    RED LED *320b*    LIGHT SENSOR *320c*    IR LED *320d*

## FIG. 3B



*412*
HOUSING (e.g., METAL INJECTION MOLDED (MIM))

*400*

*410*

BATTERY (e.g., 10 maH) *480*

*415*

*415*
FLEX CIRCUIT (FORMED)

## FIG.4



FIG. 12D

116.    Defendants have directly infringed one or more claims of the '759 Patent in this District and elsewhere in Texas, including at least claim 17 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its smart ring technology, including at least Defendants' products having materially similar configurations to a wearable smart ring device.

117.    For example, Defendants have literally and/or under the doctrine of equivalents directly infringed at least claim 17 of the '759 Patent in this District and elsewhere in Texas by or through making, using, importing, offering for sale and/or selling at least the following: Ultrahuman Ring AIR, and other Ultrahuman devices with the ability to be a finger-worn wearable ring device (collectively, "the '759 Accused Products"). *See* https://www.ultrahuman.com/ring/buy/us/. Oura reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '759 Accused Products are identified to describe Defendants' infringement and in no way limit the discovery and infringement allegations against Defendants concerning other devices that incorporate the same or reasonably similar functionalities.

118.    Each of the '759 Accused Products is observed to be a finger-worn wearable ring device. For example, each of the '759 Accused Products is observed to be a smart ring wearable device. Each of the '759 Accused Products is observed to include a housing including an interior surface and exterior surface where at least a portion of the interior surface, exterior surface, or both, comprise one or more metallic materials and at least a portion of the interior surface contacts a tissue of a user. For example, the '759 Accused Products include an outer shell of titanium reinforced with tungsten carbide carbon coating. Each of the '759 Accused Products is further observed to include a curved battery positioned within a curved portion of the housing and a printed circuit board at least partially within the housing. Additionally, each of the '759 Accused Products is observed to include a plurality of sensors for acquiring data to monitor at least one of physical activity, sleep, or health of the user that are electrically coupled with the printed circuit board and curved battery. For example, the '759 Accused Products include a six-axis motion senor to detect a user's physical movement, a temperature sensor to detect a user's skin temperature, red LEDs, green LEDs, Infrared LEDs, and an Infrared Photoplethysmography (PPG) senor to emit visible and infrared or near-infrared light used to measure the user's blood oxygenation level and heart rate. The '759 Accused Products are further capable of monitoring a user's sleep. For example, each of the '759 Accused Products can provide users with various biometric data, including a user's physical movement, temperature, heart rate, and blood oxygenation. Even further, each of the '759 Accused Products is observed to include a communication module communicatively coupled to the plurality of sensors that can transmit the sensors' data, analysis of the data generated by one or more processors, or both, to a user device. For example, each of the '759 Accused Products is enabled with Bluetooth Low Energy (BLE5) to communicate the data and/or analysis

of the data from the sensors, with a user device, such as a cell phone using the Ultrahuman application. *See, e.g.*, https://www.ultrahuman.com/ring/buy/us/.

119.    As shown below, images of exemplary '759 Accused Products, including the Ultrahuman Ring AIR, provide non-limiting examples of the '759 Accused Products infringing at least claim 17 of the '759 Patent by including "a housing," "a curved battery," "a printed circuit board," "a plurality of sensors," "one or more light-emitting components," "one or more light-receiving components," and "a communication module" as claimed in the '759 Patent:

 



Images of an exemplary size 5 Matt Grey Ultrahuman Ring AIR

 

 

Images of an exemplary size 9 Raw Titanium Ultrahuman Ring AIR

 

 

Images of an exemplary size 14 Raw Titanium Ultrahuman Ring AIR

120.    Similarly, the following excerpts from Ultrahuman's websites provides non-limiting examples of the '759 Accused Products infringing at least claim 17 of the '759 Patent:





Armed with a **6-axis motion sensor**, it captures the intricacies of your body's movements with unmatched precision. Accompanied by a non-contact temperature sensor to effortlessly monitor your body temperature.

Precision casted with a **hypoallergenic smooth inner shell**, Ring AIR curates an unmatched comfort level, enhancing your tranquillity during sleep and rest.






https://www.ultrahuman.com/






**TEMPERATURE**

## Early indicators with temperature metrics



THE HRV FACTOR

## Continuous HRV monitoring



Ring AIR's adaptive **real-time HRV (Heart Rate Variability)** monitoring measures the time between heartbeats. By tracking HRV continuously, you can identify periods of high stress or low recovery capacity, enabling informed lifestyle and stress management decisions.

Similarly, RHR (Resting Heart Rate), assesses an individual's average heart rate while at rest. It offers valuable insights into your cardiovascular health, fitness levels and overall well being. By consistently monitoring the RHR you can track your progress, identify trends or irregularities, and make informed decisions to improve your cardiovascular function and overall fitness.

IMPACT OF STRESS

## Regulate Stress with your body's natural rhythm



Stress Rhythm is a unique way of looking at the impact of stress on your body and managing it. **Stress Rhythm tells you if you're 'stimulated', 'relaxed', or 'stressed' by considering the variations in Heart Rate (HR), Resting Heart Rate (RHR), and Heart Rate Variability (HRV) through each of the phases of your circadian rhythm.** Based on these states, you can leverage stress at your body's peak tolerance to drive focus and productivity and avoid stress at your body's lowest tolerance for better rest and sleep quality.



**Ultrahuman Ring**

**Form**

| | |
|---|---|
| Weight | **2.4 - 3.6 grams**<br>(varies by size)<br>Feels as heavy as a US penny |
| Form Factor | **Ring**<br>no display |

**Ultrahuman Ring**

| | |
|---|---|
| Heart Rate Monitoring | **Periodically**<br>throughout the day |
| HRV Monitoring | **24/7 HRV monitoring**<br>Dynamic and actionable |
| Skin Temperature Tracking | **24/7**<br>temperature monitoring |

**Sleep**

| | |
|---|---|
| Sleep Tracking | ✓ |
| Sleep Metrics | Comprehensive Sleep Stages Tracking with 10+ Contributing Metrics |

**Ultrahuman Ring**

**Recovery**

| | |
|---|---|
| HRV Monitoring | Dynamic Recovery tracking via SDNN, RMSSD metrics |
| Stress Monitoring | ✓ |

**Function**

| | |
|---|---|
| Battery Life | **4 to 6 days** |
| Full Charging Time | **180 minutes** |
| Water Proof | Up to 100 meters (about 328 feet) for up to 12 hours |

**Ultrahuman Ring**

**Movement & Workout**

| | |
|---|---|
| Step Counting | ✓ |
| Distance and Calories | ✓ |
| VO2 Max | ✓ |

|  | Ultrahuman Ring |
|---|---|
| Form Factor | 🖐<br>**Ring**<br>**no display** |
| Circadian Rhythm Tracking | ✓ |
| Temperature-Based Ovulation Prediction | ✓ |
| Caffeine Window Detection | ✓ |
| AFib Detection | ✓<br>(limited regions) |







# Technical Specifications



| Body | Dimensions | | Weight |
|---|---|---|---|
| | Width - 8.1mm | | 2.4 - 3.6 g (varies with size) |
| | Thickness - 2.45 - 2.8 mm (varies with size) | | |

| Material | The outer shell is made from fighter jet grade Titanium reinforced with Tungsten Carbide Carbon coating, making it resistant to everyday wear and tear |
|---|---|
| | The inners of the ring is coated with medical-grade hypoallergenic epoxy resin, making it comfortable to wear at all times |

| Connectivity | Bluetooth Low Energy (BLE5) |
|---|---|
| | Automatic firmware updates via the Ultrahuman App |
| | Compatible with iPhones running iOS 15 or later and Android devices running Android 6 or later. |
| | EMF radiation safe |

| Sensors | Infrared Photoplethysmography (PPG) sensor |
|---|---|
| | Non-contact medical-grade skin temperature sensor |
| | 6-axis motion sensors |
| | Red LEDs (heart rate monitoring and oxygen saturation) |
| | Green LEDs (heart rate monitoring) |
| | Infrared LEDs (heart rate monitoring) |

| Battery | Rechargeable, non-replaceable 24mAh LiPo battery |
|---|---|
| | Lasts 4 to 6 days on a full charge |
| | 180 mins to fully charge the Ring from 0% to 100% |

https://www.ultrahuman.com/ring/buy/us/

| Which finger is optimal for wearing the ring? | We suggest wearing the ring on your index, middle, or ring finger. The ultimate choice among these depends on which finger provides the most comfortable fit or aligns with your personal preference. Here's a more detailed guide to determining the right ring size. |
|---|---|
| What is Ultrahuman Ring AIR made of? | The Ultrahuman Ring AIR is meticulously crafted from durable titanium and further reinforced with a tungsten carbide coating, augmenting its resilience for everyday activities. |

| How does the ring capture and measure body signals? | The Ultrahuman Ring AIR employs an array of sensors, including a temperature sensor, a PPG (photoplethysmography) sensor, and a motion-sensing IMU (inertial measurement unit). By capturing signals from your finger, these sensors enable the ring to collect vital data. These signals are then processed using advanced algorithms, developed by Ultrahuman, to provide you with profound metabolic insights and a comprehensive understanding of your body's dynamics. |
| What is Heart Rate Variability (HRV)? | Heart Rate Variability, commonly abbreviated as HRV, refers to the extent of fluctuation or variation in your heart rate over a specific timeframe. HRV serves as a valuable metric for assessing physical well-being, including heart conditions, as well as mental health factors such as anxiety and stress levels. Generally, a higher HRV is regarded as an indication of better overall health. |
| What specific parameters can the ring monitor? | The Ring AIR is capable of tracking a comprehensive range of metrics associated with Sleep, Movement, and Recovery. This includes Heart Rate, HRV, Body Temperature, SPO2, Sleep Stages, Movement Frequency, and Recovery patterns, among others. Additionally, it offers real-time insights designed to guide you towards making healthier daily decisions. These metrics are also seamlessly integrated with the broader Ultrahuman ecosystem of products, such as the Ultrahuman M1. |
| What distinguishes the Ring AIR from the Ring (R1)? | The Ultrahuman Ring AIR exemplifies an evolution in design and user experience. With a svelte profile at only 2.4 mm thick, the AIR offers unmatched comfort and wearability. The Ring AIR remains impressively lightweight at just 2.4 grams*. It achieves this without compromising on the suite of features, accuracy, or battery life that is appreciated in the R1 model.<br><br>*_The weight specification is provided with reference to well-known and globally recognized smart rings currently available on the market._* |
| What safety considerations have been incorporated into the design and construction of the ring? | The Ultrahuman team prioritizes the safety and comfort of users in the design and engineering of their products. The Ultrahuman Rings have been meticulously crafted with user comfort in mind. The inner side of the rings features a transparent hypoallergenic plastic-based material that comes into contact with your skin, ensuring a comfortable experience. Additionally, the outer shell of the ring is constructed from Titanium, chosen for its durability and longevity. Titanium provides the necessary strength and resistance to deformation.<br><br>In rare and exceptional circumstances, should the need arise, any Ultrahuman Ring can be safely removed using either manual or power ring cutters, ensuring the wearer's well-being. |

https://www.ultrahuman.com/ring/faq/

121.    The foregoing features of the '759 Accused Products and Ultrahuman's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendants' direct infringement by satisfying every element of at least claim 17 of the '759 Patent, under 35 U.S.C. § 271(a).

122.    Defendants have indirectly infringed at least claim 17 of the '759 Patent in this District and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '759 Accused Products. Defendants' customers who purchase devices and components thereof and operate such devices and components in accordance with Defendants' instructions directly infringe one or more claims of the '759 Patent in violation of 35 U.S.C. § 271. Defendants instruct their customers through at

least user guides or websites, such as those located at: https://www.ultrahuman.com/; https://www.ultrahuman.com/ring/buy/us/; https://www.ultrahuman.com/ring/faq/; https://blog.ultrahuman.com/blog/; https://blog.ultrahuman.com/blog/getting-started-with-the-ultrahuman-ring-onboarding-guide/; and https://m.media-amazon.com/images/I/B16CaytYUfL.pdf?ref=dp_product_quick_view.

123.    For example, as shown above Defendants instruct their customers that the Ultrahuman Ring AIR "accurately tracks sleep, HRV, temperature, and movement with daily actionable health insights" and instruct customers to wear the '759 Accused Products on their finger because "[t]he finger, with its higher perfusion index and arterioles, serves as a richer and more accurate source of biomarker information" compared to the wrist. *See* https://www.ultrahuman.com/.

124.    Defendants are thereby liable for infringement of the '759 Patent pursuant to 35 U.S.C. § 271(b).

125.    Defendants have indirectly infringed at least claim 17 of the '759 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '759 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '759 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

126.    For example, the '759 Accused Products include hardware and software for implementing health tracking functionality in a smart ring wearable, including a curved battery, housing, sensors, a printed circuit board, and communication module. These are components of a

patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, these components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendants are liable for infringement of the '759 Patent pursuant to 35 U.S.C. § 271(c).

127.    Defendants have been on notice of the '759 Patent since, at least, the filing of this Complaint. By the time of trial, Defendants will thus have known and intended that its continued actions would actively induce and contribute to actual infringement of at least claim 17 of the '759 Patent.

128.    Defendants undertook and continued their infringing actions despite an objectively high likelihood that such activities infringed the '759 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least the filing of this Complaint, Defendants have been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '759 Patent, and that the '759 Patent is valid. On information and belief, Defendants could not reasonably, subjectively believe that their actions do not constitute infringement of the '759 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that their actions constitute infringement, Defendants continued their infringing activities. As such, Defendants have willfully infringed and continues to willfully infringe the '759 Patent.

129.    Oura has been and continues to be damaged by Defendants' infringement of the '759 Patent.

## **PRAYER FOR RELIEF**

WHEREFORE, Oura prays for relief as follows:

A.      An adjudication that Defendants have infringed one or more claims of the '228, '229, '530, '531, and '759 Patents, literally and/or under the doctrine of equivalents;

B.      An adjudication that Defendants have indirectly infringed one or more claims of the '228, '229, '530, '531, and '759 Patents, literally and/or under the doctrine of equivalents;

C.      An award of damages to be paid by Defendants adequate to compensate Oura for Defendants' past infringement of the '228, '229, '530, '531, and '759 Patents, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses, and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

D.      An award related to any other equitable relief which may be requested and to which Oura is entitled;

E.      A declaration that this case is exceptional under 35 U.S.C. § 285;

F.      An award of Oura's reasonable attorneys' fees;

G.      A declaration that Defendants' acts of infringement were willful;

H.      An award of enhanced damages against Defendants pursuant to 35 U.S.C. § 284; and

I.      An award to Oura of such further relief at law or in equity as the Court deems just and proper.

### JURY TRIAL DEMANDED

Oura hereby demands a trial by jury.

Dated: September 3, 2025

By: _/s/ Shaun W. Hassett_____

Michael E. Jones, State Bar No. 10929400
Shaun W. Hassett, State Bar No. 24074372
**POTTER MINTON, P.C.**
102 N. College Ave., Suite 900
Tyler, TX 75702
(P) (903) 597-8311
(F) (903) 531-3972
mikejones@potterminton.com
shaunhassett@potterminton.com

Jasjit S. Vidwan
James A. Fussell, III
Saqib J. Siddiqui
Bryan Nese
Tiffany Miller
Amanda Stephenson
Seth W. Bruneel
Courtney Krawice
Séké Godo
Paul Choi*
**MAYER BROWN LLP**
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000
jvidwan@mayerbrown.com
jfussell@mayerbrown.com
ssiddqui@mayerbrown.com
bnese@mayerbrown.com
tmiller@mayerbrown.com
astephenson@mayerbrown.com
sbruneel@mayerbrown.com
ckrawice@mayerbrown.com
sgodo@mayerbrown.com
pchoi@mayerbrown.com

Robert G. Pluta
**MAYER BROWN LLP**
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
rpluta@mayerbrown.com

*Counsel for Plaintiff Ouraring, Inc.*
*\*pro hac vice forthcoming*